## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARLEY MONNINGER, | : | CIVIL NO: 1:13-CV-02471 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Kane) |
| v. | : | |
| | : | (Magistrate Judge Schwab) |
| SHIPPENSBURG UNIVERSITY, | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

### I. Introduction.

The plaintiff, Harley Monninger ("Monninger"), commenced this *pro se* action pursuant to the provisions of 42 U.S.C. §§ 1983 and 1985(3), the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et. seq*., and the Rehabilitation Act of 1973 (the "RA"), as amended 29 U.S.C. § 701 *et seq*., by filing a complaint (*doc. 1*) on September 27, 2013, followed by an amended complaint (*doc. 7*) on February 18, 2014.  In the amended complaint, Monninger names as the defendants Shippensburg University (hereinafter, "Shippensburg" or the "University") and the following seven individuals, all of whom are either current or former professors or administrators employed by the University: (1) James Mike ("Mike"), Dean of the College of Arts and Sciences; (2) Kim Long ("Long"), Associate Dean of the College of Arts and Sciences; (3) James Johnson

("Johnson"), Dean of the College of Education and Human Services Department; (4) William Blewett ("Blewett"), Geography Department Chair; (5) Tracy Schoolcraft ("Schoolcraft"), Associate Provost; (6) Kurt Fuellhart ("Fuellhart"), a professor; and (7) Janet Smith ("Smith"), also a professor.[1] *Doc. 7* at ¶¶ 2-9.

Monninger, a former student of Shippensburg, alleges that the University failed to implement accommodations for his disability and discriminated against him on the basis of his disability, in violation of the ADA and RA. *Id.* at ¶¶ 186-96; ¶¶ 208-19. Monninger further alleges that, also in violation of the ADA and RA, the University retaliated against him for requesting such accommodations and for filing a complaint with the U.S. Department of Education, Office of Civil Rights (hereinafter, the "OCR"). *Id.* at ¶¶ 197-207; ¶¶ 220-31. In addition, Monninger alleges that: (1) defendant Smith retaliated against him in violation of the First Amendment by threating him and by referring him, or causing him to be referred, to an intervention program at the University (*id.* at ¶¶ 232-39); (2) defendants Smith, Fuellhart, and Johnson treated him differently from other students in violation of the equal protection clause of the Fourteenth Amendment by applying educational standards to him in advance of when such standards are normally applied to students (*id.* at ¶¶ 240-44); (3) defendants Mike, Blewett, and

---

[1] The titles of these individuals have been culled from the amended complaint (*doc. 7*) and the materials in the record.

Schoolcraft deprived him of procedural due process, also in violation of the Fourteenth Amendment, because the process for appealing his grade was inadequate (*id.* at ¶¶ 255-61); and (4) defendants Smith, Fuellhart, Blewett, Long, Mike, and Johnson conspired to deprive him of his right to equal protection by treating him differently from other students and by denying him access to, and the benefits of, his education (*id.* at ¶¶ 245-54).  After the defendants filed an answer (*doc. 10*) to the amended complaint, the parties engaged in extensive discovery. Following the close of the discovery period, the defendants collectively filed a motion (*doc. 66*) for summary judgment, along with a brief in support, a statement of material facts, and underlying exhibits.[2]  Monninger then filed a cross motion (*doc. 92*) for summary judgment, along with his brief in support, a statement of material facts, and underlying exhibits.  The motions have been fully briefed and are ripe for disposition.  For the reasons that follow, we recommend granting in part and denying in part both motions.

---

[2] As reflected on the docket, the defendants were instructed to file a revised brief in support of their motion for summary judgment, as well as a revised statement of material facts. *Doc. 87* at 2 (ordering such revisions following an in-person discovery conference); *compare docs. 67, 69* (original documents) *with docs. 89, 91* (revised documents).

## II. Statement of Facts.[3]

Although the parties have filed cross-motions for summary judgment, the undisputed, material facts—except where expressly noted—can be stated together as follows:

### A. Background Information.

Several years after birth, Monninger was diagnosed with bi-lateral hearing loss. *Doc. 89* at ¶ 3. He has no hearing in his left ear and moderate to profound hearing loss in his right ear. *Id.*

### B. Accommodations Provided to Monninger.

Monninger was accepted into Shippensburg's College of Arts and Sciences as a transfer student for the Fall 2011 semester. *Id.* at ¶ 10. Wanting to pursue a teaching degree, he declared his major as Bachelor of Science in Education in Geography/Social Studies (the "BSED Program"). *Id.* At some point during the summer of 2011, prior to the start of the Fall semester, Monninger contacted the

---

[3] Pursuant to the Local Rules for the U.S. District Court for the Middle District of Pennsylvania (the "Local Rules"), a party moving for summary judgment must attach to the motion "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1. The non-moving party is required to submit "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in [the moving party's statement of the material facts], as to which it is contended that there exists a genuine issue to be tried." *Id.* Both statements must reference the record for support, and the moving party's statement will be deemed admitted unless controverted by the non-moving party. *See id.*

Office of Disability Services at Shippensburg and scheduled an appointment. *Doc. 89* at ¶ 11.   At his appointment, he met with Paula Madey ("Madey"), the Director of the Office of Disability Services, and requested the following accommodations for his bi-lateral hearing loss: priority seating in his classes and a note-taker.  *Id.* at ¶ 12; *see also doc. 68-1* at 14 (dep. 43-44) (explaining that note-takers are students who "essentially" take notes during class and provide a copy of those notes to the Office of Disability Services, which in turn provides a copy to the student—in this case, Monninger).   Madey granted both of Monninger's requests, as well as other general accommodations for his bi-lateral hearing loss. *Doc. 89* at ¶ 13.  In addition to these accommodations, Monninger later received three more accommodations in the form of an exemption from the foreign language requirement, access to his professors' power point presentations, and priority scheduling.[4]  *Id.* at ¶ 17; ¶ 18; ¶¶ 26-29.

### C. Alleged Problems with the Accommodations.

#### 1. Power Point Presentations.

Approximately one to two weeks after the Fall 2011 semester started, Monninger sent an email to Madey, requesting copies of his professors'

---

[4] In September of 2011, Monninger underwent surgery to remove a cancerous spot from his forehead.  *Doc. 89* at ¶ 19.   Although this surgery is mentioned throughout the record, it is undisputed that Monninger only requested accommodations based upon his bi-lateral hearing loss.  *Id.* at ¶¶ 19, 20.

presentation materials. *Doc. 89* at ¶ 26. Monninger, however, did not properly describe his request in this email, and Madey thought he was referring to overheads. *Id.* at ¶ 27. Monninger subsequently had a discussion with Madey and clarified that he was actually requesting copies of his professors' power point presentations. *Id.* at ¶ 28. Monninger's request was granted approximately ten days to two weeks after his initial email. *Id.* at ¶ 29. Monninger was able to receive, and did receive, all of the power point slides he wanted (*id.* at ¶¶ 30, 33); Monninger was able to review the slides (*id.* at ¶ 30); and Monninger was never told that he could not review slides (*id.* at ¶ 31). And, although defendant Fuellhart, during the Spring 2012 semester, agreed to provide Monninger with copies of all of his slides, Monninger declined the offer. *Id.* at ¶ 32.

### 2. Note-Taker.

Although Monninger asserts that there were several issues with the note-taker accommodation, including the "quality of the [student's] notes," Monninger does not dispute that he was granted this accommodation and that he received notes for all of his classes in the Fall 2011 semester. *Id.* at ¶ 14; *doc. 98-9* at ¶ 14. Monninger also does not dispute that he was assigned a note-taker for all of his classes in the Spring 2012 semester. *Doc. 89* at ¶ 15.

### 3. Priority Seating.

Monninger did not have any issues with his priority seating accommodation in Professors Feeney, Berry, and Fuellhart's classes during the Spring 2012 semester. *Doc. 89* at ¶ 23.   In both Professor Nomura's class and Professor Sachleben's class, however, Monninger was refused this accommodation. *Doc. 92-2* at ¶¶ 3, 4; *doc. 104* at ¶¶ 3, 4.   When asked in his deposition how he was harmed by Professor Nomura's refusal, Monninger stated that it was demeaning. *Doc. 89* at ¶ 25.   Monninger also clarified in his written declaration, however, that he "assumed . . . it was obvious that a failure to implement such an accommodation for a person with a hearing disability was inherently harmful . . . [and that it] impacted [his] ability to hear and participate in [Professor Nomura's] class." *Doc. 98-11* at ¶ 19; *see doc. 89* at ¶ 25; *doc. 98-9* at ¶ 25.

### D. Issues with Monninger's Grades and Attendance.

Monninger considered withdrawing from all of his classes during the Fall 2011 semester and spoke to Professor Hawkins—a professor in the geography department and, at the time, "interim department chair"—about this possibility. *Doc. 89* at ¶ 34; *see doc. 68-1* at 19 (dep. 64).   Monninger ultimately decided, however, not to withdraw because he thought he could handle his courses. *Doc. 89* at ¶ 34.   Monninger's grades for the Fall 2011 semester were as follows: one A; two B's; and one B minus. *Id.* at ¶ 35.   His overall GPA at the end of the Fall 2011

semester was 3.175.  *Id.*

On or about March 28, 2012, during the spring semester, Monninger had a telephone conversation with defendant Smith.  *Doc. 89* at ¶ 38; *doc. 98-9* at ¶ 38; *see also doc. 98-11* at ¶ 5.  Although it is disputed whether, during that conversation, Monninger became combative, yelled at Smith, and told her he was going to get a lawyer and sue her, it is undisputed that Smith told Monninger that she had become aware of issues regarding his class attendance and his overall professionalism.  *Doc. 89* at ¶ 38; *doc. 98-9* at ¶ 38; *doc. 98-11* at ¶¶ 5, 6.

Brian Johnson, the Executive Assistant to the Provost, also became aware, during the Spring 2012 semester, of issues regarding Monninger's class attendance.  *Doc. 89* at ¶ 36.  At some point during the semester, Monninger went to Johnson's office, and Johnson asked Monninger about these issues.  *Id.* at ¶ 37. What Monninger said to Johnson is disputed.  Specifically, it is disputed whether Monninger said that he was smarter than his professors and that he doesn't have to go to class if he knows the material.  *Id.*; *doc. 98-9* at ¶ 37; *see also doc. 90-3* at ¶ 9; *doc. 68-1* at 24 (dep. 85).

Monninger's grades for the Spring 2012 semester at Shippensburg were as follows: three B's; one W (Withdrawal); and one F.  *Doc. 89* at ¶ 40.  His overall GPA at the end of the Spring 2012 semester was 2.259.  *Id.*  Monninger did not consider taking a medical withdrawal from all of his classes during the Spring

2012 semester because he was "doing fine" in the majority of his classes.  *Doc. 89* at ¶ 42.

### E. Monninger's Grade Appeal.

During the Spring 2012 semester, Monninger missed an exam in Professor Feeney's course, and Professor Feeney does not allow make-up exams.  *Doc. 89* at ¶ 44.  Although Monninger disputes why he stopped attending Professor Feeney's classes—i.e., he believed he reached an agreement with her, under which she would grant him an Incomplete grade (*doc. 98-9* at ¶ 45; *doc. 68-1* at 26-27 (dep. 91-94))—it is undisputed that he stopped attending her classes.  *Doc. 89* at ¶ 45; *doc. 98-9* at ¶ 45.

Around this same time period, in April of 2012, Brian Johnson received several emails from Monninger with questions regarding a potential Incomplete grade in one of his courses.  *Doc. 89* at ¶ 46.  Brian Johnson forwarded Monninger's emails to defendant Mike.  *Id.* at ¶ 47.  Mike responded to Monninger *via* email and explained that it is up to the course instructor whether the grade of Incomplete is awarded for a single course.  *Id.* at ¶ 48.  Mike provided Monninger with Shippensburg's policy regarding the temporary grade of Incomplete, as found in the University catalog:

> The grade of I (incomplete) can be given if you are unable to complete the requirements of a course due to a serious illness, death in the family, or other personal emergency. To request an incomplete in a particular course, you should apply directly to

9

the instructor of the course. Apply to your college dean if you are unable to complete the requirements of all your courses. If the dean or instructor considers your reason for requesting an incomplete satisfactory, he/she will approve it. If you do not complete the work for a course in which you received a grade of I by the end of the next full semester, you will receive a grade of F for that course. You may not graduate from the university with a temporary grade on your record.

*Doc. 89* at ¶ 49.

Monninger eventually filed a formal grade appeal for the "F" he received in Professor Feeney's course. *Id.* at ¶ 50. On his Undergraduate Grade Appeal Form, Monninger listed the "Basis for the Appeal" as "The Course Instructor acted in an 'Arbitrary and/or Capricious' Manner in Assigning Grades, including the Final Course grade to the Student." *Id.* at ¶ 51. Monninger listed his grade given by the instructor as "F," and the grade expected by the student as "I," meaning Incomplete. *Id.* at ¶ 52. Monninger received a hearing on this appeal before a six member committee, which was comprised of three professors and three students (hereinafter, "grade appeal committee" or "committee"). *Id.* at ¶¶ 54, 55. During the hearing, Monninger was allowed to present evidence. *Id.* at ¶ 54. The committee ultimately denied Monninger's grade appeal. *Id.* at ¶ 57.

Thereafter, Monninger sent defendant Mike a request for reconsideration, which asked the College of Arts and Sciences to award him a grade of Incomplete for, or a Withdrawal from, Professor Feeney's course. *Id.* at ¶¶ 58-59. In the alternative, Monninger asked for an entirely new grade appeal. *Id.* at ¶ 59. This

request was denied, and Mike *via* correspondence explained to Monninger that:

> Grades are assigned by faculty and it is not within the purview of the dean's office to award grades for courses. Disputes arising from the assignment of grades are mediated through the Grade Appeals Procedure as outlined in the University Bulletin, which has occurred.
>
> With regard to withdrawals, as outlined on pages 21 and 22 of the current bulletin, students may withdraw from classes up to the deadlines as defined. The policies for medical withdrawals are provided in the same section.

*Doc. 89* at ¶ 60.  Monninger also requested reconsideration of the decision of the grade appeal committee.  *Id.* at ¶ 61.  This request was likewise denied, and Mike explained the following to Monninger:

> In your request, you did not provide evidence of substantial procedural irregularities or inequities in the conduct of the hearing.
>
> In your request, you did not demonstrate that the committee's decision was erroneous or unfair.
>
> After consideration of your request, it is my determination that you have not presented a compelling reason to set aside the decision of the [c]ommittee.

*Id.*  Prior to making his decision, Mike, who did not participate in Monninger's grade appeal process (*id.* at ¶ 53), reviewed the entire process, what occurred at the hearing, and how Monninger was treated.  *Id.* at ¶ 62.  He also spoke to several members of the grade appeal committee who heard Monninger's case.  *Id.*  Given all of this information, Mike believed that Monninger was simply rehashing

everything he had already brought before the committee and that Monninger did not present any new evidence for him to consider and that, therefore, there was no basis upon which to overturn the committee's decision. *Doc. 89* at ¶ 63. Monninger, who could have re-taken the course in which he received an "F" in over the summer, chose to pursue his grade appeal instead. *Id.* at ¶ 66.

**F. Smith and Monninger's Portfolio.**

According to the amended complaint, Monninger was required to turn an assignment, called the "professional portfolio,"[5] in to defendant Smith on April 15, 2012. *Doc. 7* at ¶ 120. Monninger did so on April 16, 2012. *Doc. 89* at ¶ 70. That same day, Smith, who was serving as Monninger's academic advisor for the 2011-2012 school year, sent Monninger an email explaining to him that she received his portfolio, that she would review his portfolio, and that she would contact him "*only if* " there was anything to review or anything that needed to be addressed. *Id.* at ¶¶ 68, 70. (emphasis in original). Although Monninger does not dispute the contents of that email, he does dispute whether there were in fact issues with his portfolio such that Smith, as his academic advisor, should have brought those issues to his attention. *See id.* at ¶¶ 69-70; *98-9* at ¶¶ 69, 121. In support, Monninger has produced two handwritten notes (*doc. 98-1* at 1), which he proffers

---

[5] In the amended complaint, Monninger alleges that this portfolio "detail[s] [his] experiences with various field assignments[.]" *Doc. 7* at ¶ 120. Beyond this allegation, however, the content of this portfolio is unclear.

were contained in his portfolio when it was returned to him, and argues on the basis of the information in those notes, that there were issues with his portfolio.

Monninger was assigned a new advisor, defendant Blewett, for the 2012-2013 academic year. *Doc. 89* at ¶¶ 74, 76; *doc. 98-9* at ¶¶ 74, 76. Because Blewett was unable to answer some of Monninger's questions, he would refer Monninger to defendant Smith, and because of that, Monninger continued to contact Smith, and Smith continued to answer all of Monninger's questions. *Doc. 89* at ¶ 75; *doc. 98-9* at ¶ 75. Smith also kept in close contact with Blewett, Monninger's new advisor. *Doc. 89* at ¶ 75; *doc. 98-9* at ¶ 75. When asked in his deposition how he was harmed by Smith ultimately withdrawing as his advisor, Monninger stated that he was given forms[6] and talked to at a later point in time than the other students registering for the Methods class. *Doc. 89* at ¶ 77; *doc. 98-9* at ¶ 77; *see also doc. 68-1* at 33 (dep. 120). In addition, Monninger stated at his deposition that Blewett, as his new advisor, was unfamiliar with the program and was unable to answer his (Monninger's) questions. *Doc. 89* at ¶ 77; *doc. 98-9* at ¶ 77; *see also doc. 68-1* at 33 (dep. 121).

---

[6] Monninger did acknowledge in his deposition, however, that he obtained these documents from someone else. *Doc. 89* at ¶ 88.

### G. Methods Registration, Professionalism, and Monninger's GPA.

There is a Methods portion to the curriculum for students seeking the BSED Program. *Doc. 89* at ¶ 78. The Methods portion consists of two classes: Teaching of Social Studies I and Teaching of Social Studies II. *Id.* The parties dispute whether the Geography-Earth Science department evaluates all of its students for their "professional disposition" prior to their enrollment in the Methods portion of their education or whether such evaluations are made during the Methods portion and student teaching. *Doc. 89* at ¶ 79; *doc. 98-9* at ¶ 79.

The defendants proffer that the Pennsylvania Department of Education requires students to have a minimum GPA of 3.0 prior to taking the Methods portion of their BSED Program.[7] *Doc. 89* at ¶ 85; *doc. 98-9* at ¶ 85. Smith explained to Monninger that he needed to maintain a 3.0 GPA in order to take the Methods courses. *Doc. 89* at ¶ 94. Smith also explained to Monninger that Shippensburg allows students to use their summer courses to boost their GPA so that they can meet that 3.0 requirement. *Id.* at ¶ 86. When Monninger asked Smith if he was registered for the Methods course in the Fall 2012 semester, she told him yes, as far as she knew he was registered. *Id* at ¶ 90. Despite Smith's belief that Monninger was registered for Methods in the Fall of 2012, the record

---

[7] In support of this proffer, the defendants cite to Smith's written declaration (*doc. 68-2* at 4, ¶ 10). Smith does not identify in her declaration, however, Pennsylvania's requirements, nor does she cite to particular parts of materials in the record to show the existence of these requirements.

indisputably demonstrates that Monninger was not registered for Methods in the Fall of 2012.  *See doc. 84-2* at ¶¶ 4-11 (Smith's written declaration explaining that, although she honestly believed Monninger was allowed to, and did in fact, enroll in the Methods classes, she was mistaken; "Monninger was never registered for Methods classes for the Fall 2012 semester"); *see also doc. 98-11 at ¶ 1* (Monninger's written declaration, which confirms that he "was never able to register" for Methods classes).  And, as discussed herein, the parties dispute the reason why he was not allowed to register for the Methods course in the Fall of 2012.  The parties also dispute whether Smith made statements to Monninger that he would not be allowed to continue in the BSED Program.  *Doc. 89* at ¶ 93; *doc. 98-9* at ¶ 93; *see also doc. 98-11* at ¶ 6.

During the summer of 2012, Monninger ultimately withdrew from the BSED Program at Shippensburg and changed his major to history.[8]  *Doc. 89* at ¶ 96. Although Monninger returned to Shippensburg for the Fall 2012 semester, he ended up dropping three of the four classes in which he was enrolled.  *Id.* at ¶ 98.

---

[8] Although Monninger does not dispute, or otherwise respond, to this fact, he does argue in his brief in opposition to the defendants' motion for summary judgment that "[he] was looking for some kind of sign from his department that he would be allowed to continue in [the BSED Program]," but "received none – thus leading to his withdrawal from the program in June of 2012."  *Doc. 98* at 12.

### H. Monninger's Referral to the Ship Cares Program.

Ship Cares is a confidential resource, referral, and intervention service in response to behavior that concerns members of the Shippensburg community. *Id.* at ¶ 99. The goal of the program is to identify students who are exhibiting concerning behavior and to design interventions and referral options that reflect the University's care, compassion, and responsibility to all. *Id.* at ¶ 100. Any member of the Shippensburg community may confidentially report the name of a person of concern to the Ship Cares Committee, along with the initial information that supports the need for concern. *Id.* at ¶ 101. The Chair of the Committee evaluates the report and, if deemed appropriate, initiates the full process, including discovery, verification, assessment, and if necessary, intervention. *Id.* at ¶ 102.

Defendant Smith did not refer Monninger to Ship Cares; Brian Johnson[9] referred Monninger to Ship Cares after he had conversations with several individuals, including Smith. *Doc. 89* at ¶ 103. Monninger was referred to Ship Cares mostly because of his academic concerns, including his frequent absences from class. *Id.* at ¶ 104. There was also concern, expressed by several individuals, regarding Monninger's use of passive threats and intimidation, as a means of attaining what he wanted, academically speaking. *Id.*

At the conclusion of the Ship Cares meeting, where Monninger's referral

---

[9] To recap, Brian Johnson is the Executive Assistant to the Provost.

was discussed, the matter was referred back to the appropriate college and department for resolution. *Id.* at ¶ 105. None of the discussions about Monninger or the information shared during that meeting were made public. *Id.* at ¶ 106.

**I. Monninger's OCR Complaints.**

Monninger filed two discrimination complaints against Shippensburg with the OCR: the first alleged that the University discriminated against him on the basis of his disability by denying his accommodation request for a copy of his professors' presentation slides, and the second alleged that the University discriminated against him on the basis of his disability and retaliated against him for having previously filed an OCR complaint. *Id.* at ¶¶ 109-111. With respect to both complaints, the OCR concluded that there was insufficient evidence to find that the University had violated the ADA or the RA. *Id.* at ¶¶ 110, 113.

**III. Legal Standards.**

Shippensburg and Monninger have filed their respective motions for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and

17

unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*,

477 U.S. at 322.   Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.   *Id.* at 252.   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.   A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.   *Id.* at 248-49.   When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial.   *Anderson,* 477 U.S. at 249.   The proper inquiry of

the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex*, 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Further, a party that moves for summary judgment on an issue for which he bears the ultimate burden of proof faces a difficult road. *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011). "[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a

20

reasonable juror would be compelled to find its way on the facts needed to rule in

its favor on the law." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007)

(footnote omitted).   A party who has the burden of proof must persuade the

factfinder that his propositions of fact are true, and "if there is a chance that a

reasonable factfinder would not accept a moving party's necessary propositions of

fact, pre-trial judgment cannot be granted." *Id*.  "Specious objections will not, of

course, defeat a motion for summary judgment, but real questions about credibility,

gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will."

*Id.*

## IV. Discussion.

### A. Monninger's Motion for Partial Summary Judgment Should be Granted in Part and Denied in Part.

In Counts I and III of the amended complaint, Monninger asserts that

Shippensburg failed to accommodate his disability and discriminated against him

on the basis of his disability in violation of both the ADA and the RA.  *Doc. 7* at ¶¶

186-96; ¶¶ 208-219.  With limited exceptions, the same standards govern both

ADA and RA claims; therefore, the Court will address Monninger's claims, raised

pursuant to those statutes, in tandem.[10]  *Chambers ex rel. Chambers v. Sch. Dist. of*

---

[10] Although much of the relevant case law for ADA and RA claims was developed
in the employment context, those principles still apply in the educational context.
*See Derrick F. v. Red Lion Area Sch. Dist.*, 586 F. Supp. 2d 282, 299 (M.D. Pa.
2008).

*Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (citing *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995)).

### 1. Failure to Accommodate Claim Under the ADA and RA.[11]

In order to prevail on a failure to accommodate claim, Monninger must establish "'(1) that [he] is disabled and otherwise qualified academically, (2) that the defendant is a private entity that owns, leases or operates a place of public accommodation (for ADA purposes) [and receives federal funding (for RA purposes)], and (3) 'that the defendant failed to make reasonable modifications that would accommodate [his] disability without fundamentally altering the nature of the public accommodation.'" *Schneider v. Shah*, 507 F. App'x 132, 137 (3d Cir. 2012) (quoting *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006)). Such a claim is not subject to the burden-shifting framework[12] set forth by the

---

[11] Even though the Defendants treat Monninger's amended complaint as only raising a failure to accommodate claim under the ADA, we note that Monninger has raised a failure to accommodate claim under both the ADA and the RA. *See doc. 7* at ¶ 191 (alleging, under the ADA, that he was deprived of accommodations); *id.* at ¶ 214 (alleging, under the RA, that he was also deprived of accommodations); *see also Muhammad v. Court of Common Pleas of Allegheny Cty., Pa.*, 483 F. App'x 759, 763 (3d Cir. 2012) ("[A] plaintiff can assert a failure to accommodate as an independent basis for liability under the ADA and RA.").

[12] Under this burden-shifting framework:

> [T]he plaintiff must [first] establish a *prima facie* case of discrimination. If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's

United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973) (hereinafter, "*McDonnell Douglas*").  *See Peebles v. Potter*, 354 F.3d 761,

766 (8th Cir. 2004) (explaining, in the employment context, that "[r]easonable

accommodation claims are not evaluated under the *McDonnell Douglas* burden-

shifting analysis . . . This is so because a claim against an employer for failing to

reasonably accommodate a disabled employee does not turn on the employer's

intent or actual motive.  The *McDonnell Douglas* line of cases, however, is aimed

at fleshing out this 'elusive factual question of intentional discrimination.'"

(quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993))); *accord*

*Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *9 (11th Cir. 2007)

(collecting cases from the United States Courts of Appeals).

Here, the first two elements are not in dispute; Monninger is disabled and

was otherwise qualified to participate in the University's program, and

Shippensburg is a place of public accommodation within the meaning of the ADA

and receives federal funding for purposes of the RA.  Therefore, the only issue in

---

rejection."  *Id.*  Finally, should the defendant carry this burden,
the plaintiff then must have an opportunity to prove by a
preponderance of the evidence that the legitimate reasons offered
by the defendant were not its true reasons, but were a pretext for
discrimination.

*Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting
*McDonnell Douglas*, 411 U.S. at 802) (italics added).

dispute is whether the University failed to make reasonable modifications to accommodate Monninger's bi-lateral hearing loss. Although Monninger requested several accommodations from the University, including being assigned a note-taker, having access to his professors' power point presentations, and having priority seating in the classrooms, he only moves for summary judgment on the basis of his priority seating accommodation. In particular, Monninger argues that, although the University granted him a priority seating accommodation, two of the University's professors—Professor Nomura and Professor Sachleben—refused to implement that accommodation. *Doc. 95.* As a result of their refusal, Monninger contends that his ability to participate in class was negatively affected and that he suffered academically, as well as emotionally. *Id.* In response to Monninger's motion, the University argues that his claim has no merit because all of his requests for accommodations were granted. *Doc. 103* at 8. The University further argues that because there was no assigned seating in Professor Nomura's class, such an accommodation was not necessary. *See id.*; *doc. 91* at 22.

Monninger is moving for summary judgment on an issue for which he bears the ultimate burden of proof and, based upon the undisputed evidence of record, we find that a reasonable juror would be compelled to find his way on the facts needed to rule in his favor. The evidence clearly and indisputably demonstrates that after Monninger transferred to Shippensburg, he contacted the University's

Office of Disability Services and scheduled an appointment to discuss his disability (bi-lateral hearing loss) and the modifications that could be made to accommodate that disability.  At his appointment, he met with Madey, the Director of the Office of Disability Services, and adequately communicated and requested the following accommodations: priority seating in his classes and a note-taker.  Monninger, who provided the necessary documentation to support his disability, was granted these accommodations, as well as several other general accommodations.  Despite being granted these accommodations, however, two of the University's professors refused to implement the priority seating accommodation for Monninger in their classrooms.   In light of their refusal, Monninger has clearly articulated how priority seating was necessary for his participation in class. *See doc. 98-11* at ¶ 19 (Monninger explaining that the "refusal to implement a seating accommodation harmed [him] . . . and impacted [his] ability to hear and participate in class. Even distances of a few feet can have a significant impact on [his] ability ot [sic] hear, furthermore, such an effect is compounded when in an educational setting as opposed to a casual setting among friends as [he] often lack[s] context when trying to learn new things and thus miss[es] more, or rather [he's] not able to fill in the gaps when [he] can't hear a lecture for example"); *doc. 92-3* at ¶ 2 (Monninger further explaining that "[p]roximity and direction are very important to [his] ability to hear.  An increased distance of a few feet with a minimal background noise can

drastically impair [his] ability to hear.  [He] ha[s] considerable difficulty hearing when the sound source is to [his] left side.").   Thus, although the University may have "granted" Monninger's accommodation in theory, the University did not actually provide him with the accommodation, therefore denying him of such.[13] Accordingly, we find that Monninger's motion for partial summary judgment should be granted with respect to his failure to accommodate claim under the ADA and RA.  *See Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.*, 458 F.3d 159, 166 (3d Cir. 2006) ("A school may not discriminate on the basis of a student's disability nor deny a reasonable accommodation to a disabled student.").

## 2. Discrimination Claim under the ADA and RA.

Monninger's discrimination claim under the ADA and RA is subject to the *McDonnell Douglas* burden-shifting framework.   *See Walton v. Mental Health Ass'n of Southeastern Pennsylvania*, 168 F.3d 661, 667–68 (3d Cir. 1999) (applying *McDonnell Douglas* to a discrimination claim under the ADA); *Wishkin v. Potter*, 476 F.3d 180, 184-88 (3d Cir. 2007) (applying *McDonnell Douglas* to a discrimination claim under the RA).   In order to establish his *prima facie* case of

---

[13] In response to the defendant's motion for summary judgment, Monninger has proffered, that after he was refused priority seating by two of his professors, he went back to the University's Office of Disability Services and communicated this refusal to personnel from that office.  *See doc. 98-11* at ¶ 18.  The University has not pointed to anything in the record to dispute this proffer, nor has the University pointed to anything in the record to suggest that the Office of Disability Services promptly or appropriately responded to the professors' refusals.

discrimination, Monninger must prove that he "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability."[14] *Chambers*, 587 F.3d at 189; *cf. CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235-36 (3d Cir. 2013) (explaining that the statutes' causation element differs in that "[t]he [RA] allows a plaintiff to recover if he or she were deprived of an opportunity to participate in a program *solely* on the basis of disability, while the ADA covers discrimination on the basis of disability, even if there is another cause as well") (emphasis added); 42 U.S.C. § 12132 (ADA, "by reason of such disability"); 29 U.S.C. § 794(a) (RA, "solely by reason of her or his disability"). And, because Monninger seeks compensatory damages (*see doc. 7* at ¶¶ 196, 219), he is required to establish that the alleged discrimination was intentional. *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013) (holding that claims for compensatory damages under § 202 of the ADA and § 504 of the RA require a finding of intentional discrimination). Intentional discrimination can be shown through deliberate indifference rather than discriminatory animus. *Id.* at 263.

Here, there is no dispute that Shippensburg regarded Monninger as having a

---

[14] Although the RA also requires the additional showing that Shippensburg receives federal funding, 29 U.S.C. § 794(a), there is no dispute that this requirement has been met.

disability and that he was otherwise qualified to participate in school activities. Thus, the sole issue before the Court is grounded in the third element of Monninger's *prima facie* case: whether Monninger was denied the benefits of an education program or subject to discrimination on the basis of his disability. In moving for summary judgment, Monninger argues that the University discriminated against him because it failed to implement his priority seating accommodation, an accommodation that was directly related to his bi-lateral hearing loss. *Doc. 95.* As a result of the University's discrimination, Monninger argues that he was unable to participate in class and therefore deprived of the benefit of his education. *Id.* In response to his motion, the University argues that Monninger has not come forward with any evidence that the alleged discrimination or denial of benefits or services was because of, or solely by reason of, his bi-lateral hearing loss. *Doc. 103* at 5.

Based upon the record before us, we find that Monninger has not established the third element of his *prima facie* case. Indeed, it is not enough for Monninger to prove that he is disabled and that the University failed to implement one of his accommodations; rather, Monninger must prove that the University failed to implement his accommodation "by reason of," 42 U.S.C. § 12132 (the ADA), or "solely by reason of," U.S.C. § 794(a) (the RA), his bi-lateral hearing loss. *See Derrick*, 586 F. Supp. 2d at 298-99 ("[A] plaintiff cannot prevail simply by

28

proving that he is disabled and that he was denied some service.  Instead, "'[t]he state must have failed to provide the service for the sole reason that the child is disabled.'" (quoting *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007))) (citing *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124 (3d Cir. 1998) (holding that the disability must be the cause of the discrimination or denial of benefits or services))); *CG*, 734 F.3d at 236 ("To satisfy either causation requirement [under the ADA or RA], Plaintiffs must prove that they were treated differently based on the protected characteristic, namely the existence of their disability.").  Monninger has not come forward with evidence from which a reasonable trier of fact could find that his bi-lateral hearing loss was the cause of the University's failure to provide him with priority seating.  Because Monninger has not established his *prima facie* case, we recommend that he be denied summary judgment on his discrimination claim under the ADA and RA.

### B. The Defendants' Motion for Summary Judgment Should Also be Granted in Part and Denied in Part.

#### 1. Retaliation Claim Under the ADA and RA.

In Counts II and IV of the amended complaint, Monninger asserts that after he engaged in protected activity by requesting accommodations and filing a complaint with the OCR, Shippensburg retaliated against him, in violation of the ADA and RA, when it failed to implement his accommodations and when it

deprived him of the benefits of the BSED Program.  *Doc. 7* at ¶¶ 201, 202, 225, 226.  As a result of these deprivations, Monninger asserts that he will have to attend college for an additional two years in order to graduate with a teaching degree.  *Id.* at ¶¶ 205, 229.  Monninger further asserts that he has suffered from extreme stress, anxiety, pain, and humiliation before his family, friends, and academic professionals.  *Id.* at ¶¶ 206, 230.

Monninger's  retaliation claim under the ADA and RA is also subject to the *McDonnell Douglas* burden-shifting framework.  *Derrick F.*, 586 F. Supp. 2d at 299.   In order to establish his *prima facie* case of retaliation, Monninger must prove: "(1) that he engaged in protected activity, and the retaliator knew of the involvement; (2) adverse action was taken by the defendant either during or after the protected activity that was sufficient to deter a person of ordinary firmness from engaging in protected activity; and (3) a causal connection between the protected activity and the adverse action."  *Id.* at 300 (citing *Shaner v. Synthes*, 204 F.3d 494, 494 (3d Cir. 2000); *Hesling v. Seidenberger*, 286 Fed. Appx. 773, 773–75 (3d Cir. 2008)).  If Monninger establishes the *prima facie* case of retaliation, then the burden of production shifts to the University to advance a legitimate, non-retaliatory reason for the adverse action.  *Derrick F.*, 586 F. Supp. 2d at 300 (citing *Shaner*, 204 F.3d at 500).  If the University satisfies its burden, then the burden of production shifts back to Monninger to identify sufficient evidence that the

University's proffered reason is pretext for retaliation. *Derrick F.*, 586 F. Supp. 2d at 300 (citing *Shaner*, 204 F.3d at 501). The burden of persuasion rests with Monninger. *See Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999) (explaining, in the context of a retaliation claim under the ADA, that "[t]he ultimate burden of persuasion rests with the plaintiff at all points throughout the analysis").

In this case, there is no doubt that the first element of Monninger's *prima facie* case is satisfied; that is, Monninger engaged in protected activity by requesting accommodations from the Office of Disability Services on July 20, 2011, and by filing a complaint with the OCR on December 12, 2011. *See doc. 7* at ¶¶ 13, 77. The University, who has not contested this element, argues instead that Monninger has either not identified sufficient adverse actions or that there is no evidence of a causal connection between Monninger's protected activity and the purported adverse actions. *See doc. 91* at 21-26. In the alternative, the University argues that it had legitimate, non-retaliatory reasons for the alleged retaliatory conduct. *See id.*

As to the second element of his *prima facie* case, Monninger appears[15] to be alleging that after he engaged in the protected activity, the University, through its

---

[15] We agree with the defendants that it is unclear what adverse actions Monninger points to in support of his retaliation claims under the ADA and RA. *See doc. 7* at ¶¶ 203, 227.

professors and administrators: (1) changed their demeanor towards him (*doc. 7* at ¶ 30; ¶¶ 33-55; ¶ 72; ¶ 84; ¶ 88); (2) failed to properly advise him (*id.* at ¶¶ 88, 143); (3) failed to register him for the Methods portion of the BSED Program (*id.* at ¶ 89; ¶¶ 140-147; ¶ 184); and (4) failed to give him a grade of incomplete when he was promised that he would be given such grade (*id.* at ¶¶ 154-162). The University, however, only addresses its alleged failure to advise him and its alleged failure to register him for the Methods portion of the BSED Program.[16] *Doc. 91* at 22-24. Because the University has not addressed Monninger's retaliation claims based upon (a) the alleged change in the demeanor of its professors and administrators, and (b) its alleged failure to give Monninger a grade of Incomplete when it promised to do so, Monninger's retaliation claims on those bases should proceed. Considering that the University has, however, addressed Monninger's retaliation claims based upon its purported failure to advise and register him, we will discuss each of those claims in turn.

---

[16] Although the University also addresses Monninger's allegations regarding (1) Professor Nomura's purported refusal to implement his priority seating accommodation (*doc. 91* at 21-22), (2) the grade appeal process at Shippensburg (*id.* at 24-25), and (3) his referral to the Ship Cares Program (*id.* at 25-26), it is our view that these allegations are not in support of his retaliation claims under the ADA and RA, and are instead in support of his failure to accommodate claim, his Fourteenth Amendment due process claim, and his First Amendment retaliation claim, respectively.

### a. Failure to Register.

We find that Monninger has met his burden of offering sufficient evidence to establish that an adverse action was taken against him when the University failed to register him for the Methods course for the Fall 2012 semester. The record establishes that beginning approximately eight months after Monninger requested accommodations from the University's Office of Disability Services and approximately three and a half months after he filed a complaint with the OCR,[17] the University did not allow him to enroll in the Methods course for the Fall 2012 semester, a course which Monninger was required to take in order to fulfill the requirements of the BSED Program at Shippensburg. This action was sufficiently adverse to him because such action would have dissuaded a reasonable student from requesting accommodations and asserting his rights with the OCR. *See Derrick* F., 586 F. Supp. 2d at 300 (applying the adverse action standard from the employment context in the educational context—i.e., "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which [in the employment context] means it well might have dissuaded a

---

[17] In the amended complaint, Monninger alleges the relevant timeline as follows: he requested accommodations on July 20, 2011; he filed a complaint with the OCR on December 12, 2011; and beginning March 27, 2012, he was unable to register for Methods. *Doc. 7* at ¶¶ 13, 77, 82-86. The University has not rebuked these dates or otherwise set forth its own timeline of these events.

reasonable worker from making or supporting a charge of discrimination.'" (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006))).

We further find that Monninger has also met his burden of offering sufficient evidence to establish that the University's actions were causally connected to his requests for accommodations and his complaint with the OCR. Monninger has established that the "evidence gleaned from the record as a whole" is probative of a causal link. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) ("To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that evidence the plaintiff must show that from the evidence gleaned from the record as a whole the trier of fact should infer causation.") (quoted cases and quotation marks omitted). In particular, we find that the University's reason as to why it did not allow Monninger to enroll in the Methods course for the Fall 2012 semester— i.e., that he was unable to meet the minimum 3.0 GPA requirement—is inconsistent with the evidence of record, which suggests that this GPA requirement was not strictly enforced. *See, e.g., doc. 98-2* at 3, 4, 7 (evidence suggesting that the University has exempted other students from this 3.0 GPA requirement). Such inconsistent reasoning gives rise to an inference of causation. *Rubano v. Farrell*

*Area Sch.* Dist., 991 F. Supp. 2d 678, 705 (W.D. Pa. 2014) (explaining, in the employment context, that inconsistent reasoning for the adverse action can establish a causal connection between the protected activity and the adverse action) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000)). Accordingly, we find that Monninger has established a *prima facie* case of retaliation regarding his inability to register for Methods during the Fall 2012 semester.

In response, however, the University has articulated a legitimate, non-retaliatory reason for not enrolling Monninger in the Methods course—i.e., Monninger did not satisfy the minimum 3.0 GPA requirement that is required for such course.  *Doc. 91* at 23-24; *see also Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997) (explaining in the employment context that "[t]he employer's burden at this stage is 'relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason *actually* motivated the [action].'" (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997), *cert. denied*, 522 U.S. 914 (1997) (emphasis added)).  In support, the University points to Monninger's GPA at the end of the Spring 2012 semester, which was a 2.259.  *Doc. 91* at 23.  Because Monninger did not have the minimum GPA of 3.0, the University argues that it had a legitimate non-retaliatory reason for

not allowing him to register for the Methods course during the Fall 2012 semester. *Id.* at 23-24.   The University further argues that such action was in compliance with the Pennsylvania Department of Education, which requires students to have a minimum 3.0 GPA prior to taking the Methods portion of the BSED Program.  *Id.* at 23.  Thus, we find that the University, which is allowed to present *any* legitimate reason for not enrolling Monninger in the Methods course for the Fall 2012, has done so. As noted above, the University is not required to show by a preponderance of the evidence that its action was, in fact, motivated by this reason. *See Krouse*, 126 F.3d at 500–01.

Having determined that the University articulated a legitimate, non-retaliatory reason, we now turn to whether Monninger has established a genuine issue of material fact that the University's proffered reason was pretext for retaliation.  We find that Monninger has presented sufficient evidence that the University proffered an inconsistent reason for not enrolling him in the Methods course for the Fall 2012 semester.  Specially, we find that while the University's argument that it acted in conformity with the Pennsylvania Department of Education's mandate may lend support to its legitimate, non-retaliatory reason for requiring a 3.0 GPA, such argument certainly gets undercut when Monninger points to evidence that suggests the University did not strictly, and consistently, enforce this requirement. *See, e.g.*, *doc. 98-2* at 3, 4, 7 (evidence suggesting that

the University has exempted other students from this 3.0 GPA requirement).  This is especially true considering that the University has not identified or included this mandate in the record.[18]   Thus, a reasonable trier of fact could find that retaliatory animus had a "determinative effect" on the University's decision.  *See Derrick*, 586 F. Supp. 2d at 300 ("Evidence [of pretext] is sufficient if it would permit a factfinder to find that retaliatory animus had a determinative effect on the defendant's action.") (citing *Shane*r, 204 F.3d at 501 n.8); *see generally Treaster v. Conestoga Wood Specialties, Corp.*, No. 4:09-CV-00632, 2010 WL 2606479, at *21 (M.D. Pa. Apr. 29, 2010), *report and recommendation adopted*, No. 4:09-CV-632, 2010 WL 2606481 (M.D. Pa. June 25, 2010) (explaining, in the employment

---

[18]   Instead, the University points to two documents, which it refers to as "Shippensburg's Requirements for Professional Standing Level One and Two Certification Programs" (hereinafter, the "Program Manuals" or "Manuals").  *See doc. 68-2* at 11, 13. These Program Manuals generally contain information about the requirements that "[a]ll K-12 and Secondary Education majors" must satisfy in order to apply for "Professional Standing Level One" and "Professional Standing Level Two" at the University.  *Id.*  Although one of these requirements is that the student must have at least a 3.0 GPA, it is unclear when this particular requirement went into effect.  As reflected on the Manuals themselves, they were "Revised August 2012."  *Id.*  If this 3.0 GPA requirement did, in fact, go into effect in August of 2012, then it went into effect months after Monninger applied for the Methods course.  And, in any event, these requirements appear to be imposed not by the Pennsylvania Department of Education, but by the University's College of Education and Human Services.  *See id.* To the extent, however, the University attempts to argue that both Manuals explicitly state that their requirements "are based on guidelines from NCATE, PDE, and Teacher Education Council," *id.*, we briefly note that the University has whole heartedly failed to shed light on this statement.

context, that "[e]vidence that the reason given for the adverse action was prextext may also be relevant to the issue of causation") (citing *Weston v. Pennsylvania*, 251 F.3d 420, 432 (3d Cir. 2001). As such, the University's motion should be denied with respect to Monninger's retaliation claim under the ADA and RA based on his inability to register for the Methods course.

### b. Failure to Advise.

We find, viewing the evidence in the light most favorable to Monninger, that genuine issues of material fact also exist regarding whether the University, through the conduct of defendant Smith, took an adverse action against Monninger when Smith purportedly failed to advise him. The record establishes that while Smith was serving as Monninger's academic advisor for the 2011-2012 year, she sent an email to Monninger on April 16, 2012 (the same day he dropped his portfolio off at her office), confirming that she received his portfolio, that she would review the portfolio, and that she would *only* contact him if there were issues with his portfolio. Then, in May of 2012, Smith withdrew as Monninger's advisor.

We find that Monninger has raised a genuine of material fact as to whether Smith may have found issues when she was reviewing the portfolio, yet failed to contact Monninger about those issues. In particular, Monninger has produced two handwritten notes, which, according to his written declaration, were included in his portfolio when it was returned to him. *Doc. 98-11* at ¶ 8. Monninger proffers that

these handwritten notes contain information related to his portfolio and that such information could only have been originated from the data contained in his portfolio. *Id.* at ¶ 9. Those notes read as follows:

-Pla-001-

This really needs more about teaching [and] learning but it's hard to know what he has had since he took American School [and] Educ. Psych at Hagerstown CC.

-Pla-002-

His working with students or youth- <u>very weak</u>. He needed an observation reflection for each experience-he has 1 but is counting 25 hours & they are with his mom.

*Doc. 98-1* at 1. Monninger argues that these notes demonstrate that there were in fact issues with his portfolio and that Smith failed to contact Monninger about these issues, even though she promised she would in her previous email and even though Monninger made multiple attempts to learn the status of his portfolio. *See doc. 98-11* at ¶¶ 8-16; *doc. 98-1* at 1; *doc. 98* at 10. Thus, we find that there are genuine issues of material fact as to whether defendant Smith failed to advise Monninger about his portfolio. Because of these genuine issues of material fact, we find that the University is also precluded from summary judgment on Monninger's retaliation claim based upon its failure to advise him.

### 2. 42 U.S.C. §1983 Claims: First Amendment Retaliation, Fourteenth Amendment Equal Protection, and Fourteenth Amendment Procedural Due Process.

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor School Dist.*, 422 F.3d 141, 146 (3d Cir. 2005). Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.* Accordingly, in order to establish a claim under Section 1983, the plaintiff must establish a deprivation of a federally protected right and that this deprivation was committed by a person acting under color of state law. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

### a. First Amendment Retaliation Claim.

In Count V of the amended complaint, Monninger asserts a 42 U.S.C. § 1983 claim for retaliation under the First Amendment against defendant Smith. More specifically, Monninger alleges that he engaged in protected speech by questioning the reviews regarding his "professional disposition" and by filing complaints with the OCR. *Doc. 7* at ¶¶ 233-34. Monninger further alleges that Smith retaliated against him for engaging in such activity by threatening to sever their professional relationship if he filed another grievance, to which Monninger alleges Smith ultimately followed through with since she withdrew as his advisor.

40

*Doc. 7* at ¶ 235. And, although Monninger also alleges in the amended complaint that Smith retaliated against him by reporting or causing him to reported to the Ship Cares program (*id.* at ¶ 237), Monninger, in responding to the defendants' motion for summary judgment, does not dispute that it was Brian Johnson, the Executive Assistant to the Provost, who actually referred him to the Ship Cares Program. *See doc. 89* at ¶ 103; *doc. 98*-9.

In moving for summary judgment, Smith argues that Monninger cannot meet his burden of proof on this claim because: she never threatened to withdraw as Monninger's advisor or otherwise sever their professional relationship; she did not know about his complaints with the OCR until after the alleged retaliatory conduct; and Monninger's allegations of harm do not rise to the level of an adverse action. *Doc. 91* at 27.

In a 42 U.S.C. § 1983 action for retaliation under the First Amendment, Monninger must establish: "(1) that [he] engaged in protected activity; (2) that the government responded with retaliation; and (3) that the protected activity was the cause of the retaliation." *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003) (citing *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). "[T]he key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *McKee v. Hart*,

436 F.3d 165, 170 (3d Cir. 2006) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).

We find, as a preliminary matter, that defendant Smith, a professor employed at a state university, is state actor for purposes of § 1983.  *See Wynne v. Shippensburg Univ. of Pennsylvania*, 639 F. Supp. 76, 80 (M.D. Pa. 1985) (finding that Bloomsburg University, a state university, is a state agency for purposes of § 1983); *Hayut v. State Univ. of New York*, 352 F.3d 733, 744 (2d Cir. 2003) ("We think it clear that a professor employed at a state university is a state actor. A professor at a state university is vested with a great deal of authority over his students with respect to grades and academic advancement by virtue of that position. When a professor misuses that authority in the course of performing his duties, he necessarily acts under color of state law for purposes of a section 1983 action.").  We also find, as a preliminary matter, that the elements of a retaliation claim under § 504 of the RA are the same as the elements of a retaliation claim under § 1983.  *Lauren W.*, 480 F.3d at 267.  Thus, for the same reasons discussed above, we conclude that Monninger has also met the first element of his retaliation claim under § 1983—that he engaged in protected activity when he filed a complaint with the OCR on December 12, 2011.  *See doc. 7* at ¶ 77; *see also R.K. v. Y.A.L.E. Sch., Inc.*, 621 F. Supp. 2d 188, 197 (D.N.J. 2008) ("The 'protected activity' referenced in the first prong is not limited to speech, but has also been

held to encompass a person's First Amendment right to petition the government for grievances.") (cited cases omitted).

With respect to the second element of his retaliation claim, however, Monninger alleges that Smith took actions against him that are different from those he alleges that the University took against him.  Thus, we must address Smith's actions separately.  And, in this regard, Monninger alleges that defendant Smith retaliated against him when she threatened to sever their professional relationship or otherwise withdraw as his advisor, and when she referred him or caused him to be referred to the Ship Cares program.  We address each of these actions in turn.

### i. Threatening to Withdraw as Monninger's Advisor.

We find, viewing the evidence in the light most favorable to Monninger, that a genuine issue of material fact exists regarding whether defendant Smith threatened to withdraw as Monninger's advisor if he filed another complaint with the OCR.  The record establishes that while defendant Smith was serving as Monninger's academic advisor for the 2011-2012 academic year, she had a conversation with him during the end of March 2012.  The parties dispute what was said during that conversation.  Smith proffers that she discussed with Monninger the importance of attending class, as it is a reflection of his professionalism. *Doc. 90-2* at 4, ¶ 12.  Smith further proffers that Monninger became extremely combative, yelled at her, and told her he was going to get a

lawyer and sue her. *Id.* In response, however, Monninger proffers that although Smith did discuss with Monninger that there were concerns about his professionalism, he did not threaten to sue her; instead, he told her that he was considering filing another complaint against defendant Fuellhart. *Doc. 98-11* at ¶ 5. Monninger further proffers that Smith raised her voiced, yelled at him, and threatened to sever their professional relationship if he filed another complaint, but that he himself was neither combative, nor yelled at her. *Id.* Because there is a genuine issue of material fact as to whether Smith threatened to withdraw as Monninger's advisor if he filed another complaint with the OCR, we find that summary judgment is not warranted on this basis, especially considering Smith ultimately withdrew as his advisor.

We similarly find that summary judgment is also not warranted on the basis that Smith did not know about Monninger's complaints with the OCR until after she allegedly threatened to sever their professional relationship. In particular, we find that Monninger has raised a genuine issue of material fact as to whether Smith knew, at the time she made the alleged threats, that Monninger had previously filed a complaint with the OCR. Monninger has raised this issue by producing a written declaration in which he proffers that Smith, during their telephone conversation in March of 2012, threatened to sever their professional relationship or withdraw as his advisor if he filed "*another* complaint." *Doc 98-11* at ¶ 5 (emphasis added).

From this, a reasonable trier of fact could infer that Smith was aware that Monninger had already filed a complaint with the OCR. This is especially true considering the phone call, and thus the alleged threats, occurred three and a half months after he filed his complaint with the OCR. Because there are genuine issues of material fact regarding Smith's knowledge, summary judgment should also not be granted on this basis.

### ii. Referring Monninger to Ship Cares.

At the outset we note that, although Monninger alleged in his amended complaint that Smith referred him to the Ship Cares program, Monninger, in responding to the defendants' motion for summary judgment, has not disputed that it was Brian Johnson who actually referred him to said program.[19] Thus, we find that there is no genuine issue of material fact that Smith did not refer Monninger to the Ship Cares program.

Even assuming, however, that Smith caused Monninger to be referred to the Ship Cares program, the record demonstrates that this referral does not constitute a sufficient retaliatory act under the First Amendment. It is undisputed that this program is a confidential resource, referral, and intervention service in response to behavior that concerns members of the Shippensburg community. It is undisputed

---

[19] In fact, Monninger has not disputed any of the defendants' facts concerning his referral to the Ship Cares program. *See doc. 98-9* at 4. Monninger has also failed to brief this issue, despite filing a brief in opposition to the defendants' motion for summary judgment. *See doc. 75.*

that any member of the Shippensburg community may confidentially report the name of a person of concern to the Ship Cares Committee, along with the information supporting the need for concern.  It is undisputed that none of the discussions about Monninger or the information shared during that meeting were made public.  Thus, we find that Monninger has not met his burden of establishing that his referral to the Ship Cares program was sufficient to deter a person of ordinary firmness from engaging in protected activity.

### b. Fourteenth Amendment Equal Protection Claim.

In Count VI of the amended complaint, Monninger asserts an equal protection claim against Smith, Fuellhart, and Johnson, alleging that they treated him differently from other students because they applied standards to him during the non-professional phase of the BSED Program, when such standards are normally not applied to students until the professional phase of the Program.  *Doc. 7* at ¶¶ 240-44.   More specifically, Monninger alleges that the "professional disposition" of a student—including, their "attendance, honesty, professional appearance, timeliness, respect for others, respect for differing viewpoints, acceptance of criticism, effective communication both orally and in writing, an[d] [their collaborative participation] with others . . . "—is normally not assessed until the Methods and Student Teaching portion of the BSED Program at Shippensburg.  *Doc. 98* at 19.  As a result of being assessed prior to the Methods and Student

Teaching portion of the BSED Program, Monninger claims that he has suffered from extreme stress, anxiety, pain, and humiliation before his family, friends, and academic professionals, and further, that he also sustained economic and academic losses. *Doc. 7* at ¶ 243.  In moving for summary judgment, Smith, Fuellhart, and Johnson argue that Monninger has failed to produce evidence, which establishes that he was treated differently from similarly situated students. *Doc. 91* at 28-30. They further argue that Monninger has also failed to produce evidence of purposeful discrimination. *Id.*

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory.  The traditional theory protects a plaintiff from discriminatory treatment based on membership in a protected class, such as race. *See, e.g.*, *id.*; *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964).  To assert a protected-class claim, the plaintiff must demonstrate that (1) he or she is a member of a protected class and (2) the government treated similarly situated individuals outside of the protected class differently. *See Oliveira v. Twp. of*

*Irvington*, 41 F. App'x 555, 559 (3d Cir. 2005) (observing that *a prima facie* case under the Equal Protection Clause requires plaintiffs to prove membership in "a protected class and that they received different treatment than that received by other similarly-situated individuals").  Under this theory a plaintiff "must prove the existence of purposeful discrimination" by the defendants. *Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 1992).

Under the class-of-one theory, a plaintiff may advance an equal protection claim absent membership in a protected class if the plaintiff shows that the defendants engaged in irrational and intentional differential treatment of him when compared with similarly situated individuals.  *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  This theory allows a plaintiff to assert an equal protection claim regardless of protected class when the government irrationally treats the plaintiff differently from similarly situated individuals.  *Id.* at 564; *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).  To prevail on a class-of-one claim, the plaintiff must demonstrate that: (1) the defendants treated him differently from others similarly situated; (2) the defendants did so intentionally; and, (3) there was no rational basis for the difference in treatment.  *Hill*, 455 F.3d at 239; *see id.* (holding that a class-of-one claim protects individuals from intentional, irrational differential treatment).

Here, although Monninger has not specified whether he brings his equal protection claim based upon the traditional theory or the class-of-one theory, we nevertheless treat his amended complaint as bringing a class-of-one theory because "disability" does not form the basis of a protected class. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366–67 (2001) (noting that disability does not form the basis for a protected class). That being said, we find, as a preliminary matter, that defendants Smith, Fuellhart, and Johnson, as professors and administrators employed at a state university, are state actors for purposes of § 1983. *See Wynne*, 639 F. Supp. at 80; *Hayut*, 352 F.3d at 744. We further find that Monninger has not provided any evidence that he was treated differently from other similarly situated individuals. Indeed, the only evidence Monninger relies on are emails from defendant Smith and defendant Johnson. In Smith's email (*doc. 98-3* at 1), she states that although a student's "professional disposition" is "generally . . . assessed in Methods and in Student Teaching . . . there is a move at Ship that we need to start this assessment earlier in [his or her] career." Johnson seems to debunk, or at least contradict, Smith's statement in his email, where he asserts that "[t]here has been no such move" at Shippensburg to evaluate the professional disposition of students prior to the Methods and Student Teaching portion of the BSED Program. *Doc. 98* at 19 (citing *doc. 98-8* at 2, ¶ 3). Even acknowledging these emails, we nevertheless find that Monninger has made no

attempt to identify similarly-situated individuals, nor has he made any attempt to compare the circumstances of how his professional disposition was assessed *with* how the professional disposition of other similarly-situated students was assessed. Without identifying the existence of such individuals, or a comparison thereof, Monninger has failed to meet his burden of producing sufficient evidence that Smith, Fuellhart, and Johnson were previously faced with this situation and proceeded differently. *See, e.g.*, *Mosca v. Cole*, 217 F. App'x 158, 164 (3d Cir. 2007) (affirming a grant of judgment for the defendant on an equal protection "class of one" claim where the plaintiff failed to identify a similarly situated individual who was treated differently); *Levenstein v. Salafsky*, 414 F.3d 767, 776 (7th Cir. 2005) (affirming a grant of judgment for the defendant on an equal protection "class of one" claim of a professor who alleged he had been constructively discharged, because the professor failed to identify another similarly situated individual who had been treated differently).  As such, defendants Smith, Fuellhart, and Johnson should be granted summary judgment on Monninger's Fourteenth Amendment equal protection claim.

### c. Fourteenth Amendment Due Process Claim.

In Count VIII of the amended complaint, Monninger asserts a procedural due process claim under the Fourteenth Amendment against defendants Mike, Blewett, and Schoolcraft. *Doc. 7* at 59, ¶¶ 255-261. In particular, Monninger

asserts that when he was appealing his grade in Professor Feeney's Spring 2012 class, he was provided with "inadequate and/or meaningless" due process because the appeal process could not address the issues he was encountering—i.e., that he was not disputing the grade he received for some academic reason, but rather, that Professor Feeney, who agreed to give him an Incomplete, later changed her mind for unknown reasons. *Id.* at ¶¶ 257-259. As a result, Monninger contends that he has suffered from extreme stress, anxiety, pain, and humiliation before his family, friends, and academic professionals, and further, that he also sustained economic and academic losses. *Id.* at ¶ 260. In moving for summary judgment on this claim, defendants Mike, Blewett, and Schoolcraft assert that Monninger does not have a property interest in his continuation in the BSED Program at Shippensburg, that he was not denied any property interest, and finally, that he was afforded all the process due to him under the Fourteenth Amendment. *Doc. 91* at 34-38.

The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." In order to prevail on a § 1983 claim for a violation of the Fourteenth Amendment's procedural protections, Monninger must prove that the state actor deprived him of a recognized liberty or property interest and that such deprivation occurred without adequate process. *Goldberg v. Egg Harbor Twp. Sch. Dist.*, No. CIV. 11-1228, 2011 WL 5554501, at *3 (D.N.J. Nov. 14, 2011) (citing *Bd. of Curators of*

*University of Missouri v. Horowitz*, 435 U.S. 78, 82 (1978) (hereinafter, "*Horowitz*"); *Robb v. Philadelphia*, 733 F.2d 286, 292 (3d Cir. 1984)). Such interests are "not generally created by the Constitution." *Robb*, 733 F.2d at 292. Instead, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

With respect to the due process rights of students in state operated universities, the United States Supreme Court "has made a clear distinction between disciplinary and academic dismissals. In the latter circumstance, courts are ill-equipped to review the largely subjective academic appraisals of the faculty." *Mauriello v. Univ. of Med. & Dentistry of New Jersey*, 781 F.2d 46, 50 (3d Cir. 1986). Indeed, "the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Horowitz*, 435 U.S. at 90. Thus, "[a] formal hearing is not necessary; rather an 'informal-give-and-take' between the student and the administrative body dismissing [him] is adequate." *Mauriello*, 781 F.2d at 50. The Supreme Court further "observed that when judges are asked to 'review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is

such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Id.* (quoting *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985) (hereinafter, "*Ewing*"). In accordance with this holding, the United States Court of Appeals for the Third Circuit has understood *Horowitz* and *Ewing* to mean that "when a student is discharged for academic reasons, an informal faculty evaluation with the student is all that is required." *Mauriello*, 781 F.2d at 51.

At the outset, we note, in accordance with the heavy mandate from the United States Supreme Court, that due respect is accorded to the discretion of the faculty at Shippensburg. *See Ewing*, 474 U.S. at 225. We further observe that this case involves an academic evaluation, not a disciplinary matter, and finally, we understand that unlike the cases cited above, we are presented not with the dismissal of a student, but with dissension over a grade the student—in this case, Monninger— received.

Turning to the merits, we preliminary find that defendants Mike, Blewett, and Schoolcraft, as administrators of the University, are state actors for purposes of § 1983. *See Wynne*, 639 F. Supp. at 80; *Hayut*, 352 F.3d at 744. We further find that even if we assume, without making a recommendation, that Monninger has asserted the existence of a protected liberty or property interest in the grades he

received at Shippensburg, we cannot find that he was deprived of such an interest when he appealed one of those grades. Upon review of the record, it is clear that Monninger's attendance and grades became an issue for him in the Spring 2012 semester. It is undisputed that, during this semester, Monninger missed an exam in Professor Feeney's course and that Professor Feeney, who does not allow make-up exams, ultimately gave Monninger an "F." In response to this grade, it is undisputed that Monninger sought and received a grade appeal hearing, which was conducted before a six-member committee that was comprised of three professors and three students. It is undisputed that Monninger was allowed to present evidence at his hearing, and that following the denial of his hearing, Monninger was permitted to file a request for reconsideration. It is undisputed that, prior to making a decision as to this request, Mike reviewed the entire grade appeal process, what occurred at the hearing, and how Monninger was treated. It is undisputed that Mike also spoke to several members of the committee, and given all this information, decided Monninger was simply rehashing the arguments squarely addressed by the committee and therefore determined that there was no basis upon which to overturn the committee's decision. And, although Monninger could have re-taken Professor Feeney's course over the summer, the course in which he received an "F," it is undisputed that he did not seize this opportunity. Thus, based upon our review of the record, it is evident that Monninger was given

the "informal-give-and-take" to which he was entitled. As such, we find that summary judgment is proper on Monninger's procedural due process claim under the Fourteenth Amendment.[20]

### 3. 42 U.S.C. §1985(3) Claim: Conspiracy.

In Count VII of the amended complaint, Monninger asserts a 42 U.S.C. § 1985(3) conspiracy claim against defendants Smith, Fuellhart, Blewett, Long, Mike, and Johnson, alleging that they conspired to deprive him of his right to equal protection. *Doc. 7* at ¶¶ 245-54. Specifically, Monninger alleges that Smith and Fuellhart tried forcing him to resign from his chosen program of study by "enacting and applying inapplicable standards of review, concocting non-existent evaluations, and confronting [him] with such." *Id.* at ¶ 247. And, with respect to Blewett, Long, and Mike, Monninger alleges that they "acted in concert to deny [him] access to any methods of recourse, meaningful due process, access to his education program, advice, and other privileges afforded to others in the same programs." *Id.* at ¶ 252. The University moves for summary judgment on this claim on the basis that Monninger only levies generalized allegations and that he has not come forward with any evidence that there was a "meeting of the minds" or that the purported conspiracy was motivated by discriminatory animus. *Doc. 91* at

---

[20] To the extent Monninger attacks not the grade appeal process itself, but the motive behind why the University would not grant him a Withdrawal, such attacks are better suited for his retaliation claim under the ADA and RA, which we have already recommend should proceed in this action.

32-33.  As such, Smith, Fuellhart, Blewett, Long, Mike, and Johnson contend that Monninger's conspiracy claim must fail.  *Id.* at 33.

42 U.S.C. § 1985(3) "permits an action to be brought by one injured by a conspiracy formed 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'"  *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (quoting § 1985(3)).  In order "[t]o establish a *prima facie* case under § 1985(3), [Monninger] must prove that: (1) [the] defendants engaged in a conspiracy, (2) the conspiracy's purpose was to deprive, either directly or indirectly, any person or class of persons of equal protection of the laws or equal privileges and immunities under the laws, (3) [the] defendants committed an act in furtherance of the conspiracy, and [finally] (4) [the] defendants' actions resulted in injury to [Monninger's] person or property or a deprivation of [his] rights or privileges as a United States citizen."  *D'Altilio v. Dover Twp.*, No. 1:06-CV-1931, 2007 WL 2845073, at *10 (M.D. Pa. Sept. 26, 2007) (citing *Farber v. City of Patterson*, 440 F.3d 131, 134 (3d Cir. 2006)).  "'The essence of a conspiracy is an agreement.'"  *Padgett v. Bradford Cty. Dist. Attorney's Office*, No. 4:11-CV-00434, 2011 WL 1832993, at *5 (M.D. Pa. Apr. 13, 2011), *report and recommendation adopted*, No. 4:11-CV-434, 2011 WL 1812191 (M.D. Pa. May 12, 2011) (quoting *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989)).

Here, we preliminarily find, once again, that defendants Smith, Fuellhart, Blewett, Long, Mike, and Johnson, as professors and administrators of the University, are state actors for purposes of § 1983. *See Wynne*, 639 F. Supp. at 80; *Hayut*, 352 F.3d at 744.   Despite overcoming this threshold hurdle, however, Monninger has failed to establish that these defendants conspired against him in violation of 42 U.S.C. § 1985(3).   In particular, Monninger has not produced any evidence that establishes the existence of an agreement among these defendants, nor has he produced any evidence to establish the object of the conspiracy, the duration of the conspiracy, or the actions taken in furtherance of the conspiracy. Thus, without proof of a conspiratorial agreement, Monninger has "fail[ed] to make a showing sufficient to establish the existence of an element essential to [his] case[.]" *Celotex*, 477 U.S. at 322.  As such, defendants Smith, Fuellhart, Blewett, Long, Mike, and Johnson should be granted summary judgment on Monninger's 42 U.S.C. § 1985(3) conspiracy claim.

## C. Conclusion

To conclude, Monninger's motion for partial summary judgment should be granted in part and denied in part.  Monninger's motion should be granted with respect to his failure to accommodate claim under the ADA and RA, and his motion should be denied with respect to his discrimination claim under the ADA and RA.

The defendants' motion for summary judgment should also be granted in part and denied in part.  The defendants' motion should be granted with respect to the following claims:

(1) Monninger's discrimination claim under the ADA and RA.

(2) Monninger's retaliation claim under the ADA and RA on the basis of his referral to the Ship Cares program;

(3) Monninger's 42 U.S.C. § 1983 claim for equal protection under the Fourteenth Amendment;

(4) Monninger's 42 U.S.C. § 1983 claim for due process under the Fourteenth Amendment;

(5) Monninger's 42 U.S.C. § 1985(3) conspiracy claim.

The defendants' motion should be denied, however, with respect to the following claims:

(1) Monninger's retaliation claim under the ADA and RA based upon the following:

(a) the University's failure to register him for the Methods course;

(b) the University's failure to advise him;

(c) the University's failure to give him a grade of incomplete when he was promised that he would be given such grade; and

(d) the University's change in demeanor towards him.

(2) Monninger's retaliation claim under the First Amendment based on defendant Smith's threats to sever their professional relationship or otherwise withdraw as his academic advisor.

(3) Monninger's failure to accommodate claim under the ADA and RA.

## V. Recommendation.

Accordingly, **IT IS HEREBY RECOMMENDED** that Monninger's motion (*doc. 92*) should be **GRANTED** in part and **DENIED** in part and that the defendants' motion (*doc. 66*) should also be **GRANTED** in part and **DENIED** in part.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen  (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall

witnesses or recommit the matter to the magistrate judge with instructions. Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **16th** day of **August, 2016**.

***S/ Susan E. Schwab***
Susan E. Schwab
United States Magistrate Judge